**Brenda BUSH, Plaintiff,**

v.

**AMERICAN HONDA MOTOR CO., INC., Defendant.**

**Case No. C–3–00–358.**

United States District Court, S.D. Ohio, Western Division.

Sept. 6, 2002.

Aaron G. Durden, Dayton, OH, for Plaintiff.

Theodore P. Mattis, Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant.

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 12); JUDGMENT TO ENTER FOR DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiff Brenda J. Bush filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against her employer, Defendant American Honda Motor Co., Inc. ("Honda"), on the basis of alleged racial discrimination. (*See* attachment to original Complaint (Doc. # 1).) On April 28, 2000, the EEOC closed the file and issued Bush notice of her right to sue.[1] Subsequently, Bush filed the underlying Amended Complaint (Doc. # 2) against Honda on several grounds, including, (1) infliction of emotional distress, (2) negligent hiring, retention, and entrustment of authority, (3) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and (4) Chapter 4112 of the Ohio Revised Code. The general basis for all of her claims is her belief that she was demoted wrongfully from a supervisory position at Honda on account of her race.

Honda denies liability, and argues that Bush has failed to make a prima facie showing of discrimination, and that, in any event, it has handled issues of her employment in a legitimate, nondiscriminatory manner. It now moves for summary judgment (Doc. # 12).

As shall be discussed, for essentially all of the reasons stated in its Motion, the Court finds Defendant's argument well taken. Accordingly, it shall grant the Motion.

I. *Factual Background*[2]

Plaintiff Bush began working for Defendant Honda in March, 1977. (Bush Aff., attached to Bush's Response Brief (Doc. # 14), ¶ 2.) Over the ensuing decade, Bush enjoyed several promotions. (*Id.* ¶¶ 3, 4.) Then, in 1988, Bush, an African–American female, filed a discrimination charge against Honda. (*Id.* ¶ 5.) This charge was settled and withdrawn. (Bush Depo. at 182; *id.* at Ex. E.) Although a promotion was not expressly tied to the settlement (Bush Depo. at 182.), Bush was subsequently promoted to the position of Parts Center Warehouse Supervisor. (Bush Aff. ¶ 5.)

In her supervisory position, Bush supervised about 15 employees. (*Id.* ¶ 6.) From that position, she was demoted to a regular employee position on or around November 20, 1998.[3] (*Id.* ¶ 7; Bush Depo. at 260.) It is the demotion which precipitated the underlying EEOC claim and lawsuit. The Court understands that Bush continues to be employed at Honda.

Another supervisor, Theresa Geary, was demoted on the same date as Bush. (Smith Aff., attached to Doc. # 12 at Ex. 1, ¶ 6.)

1. The file was closed because it was not filed in a timely manner.

2. For purposes of ruling on Honda's Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to Bush, who is the non-moving party.

3. November 20, 1998, is the date Bush noted as the date of discrimination on her 1999 EEOC Charge of Discrimination. Other exhibits in the record indicate that she was given notice of her demotion on November 11, 1998 (Bush Depo. at Ex. R), and final confirmation on January 13, 1999. (*Id.* at Ex. V.) The exact date of her demotion is immaterial, but the Court notes that in her Response (Doc. # 14), Bush erroneously states that her demotion occurred in November of 1999. (Doc. # 14 at 2.)

Immediately following the demotions, the supervisory duties were assumed by Joseph Kennedy, a Caucasian male. (Bush Aff. ¶ 8.) However, according to the manager at the parts warehouse, Bruce Smith, Kennedy's was an interim assignment, and shortly thereafter, in December, 1998, and January, 1999, respectively, the positions were permanently filled. (Smith Aff. ¶ 6.) The two individuals to assume the permanent supervisory positions, Karim Malki and Troy Pope, are African–American males. (*Id.*) In addition, three other individuals subsequently assumed the supervisory positions which Bush and Geary had formerly occupied. They are Dave Allison, a Caucasian male, who transferred into the position from another Honda department in March, 1999; Kevin Barnes, an African–American male, who was hired into the position in May, 1999; and Wendall Banks, an African–American male, who was hired into the position in July 1999. (*Id.* ¶ 7.)

Honda's purported reasons for demoting Bush were her poor job performance and attendance record. (*Id.* ¶¶ 3, 4, 9.) Specifically, Honda cites the following deficiencies in Bush's performance: (1) her failure to complete in a timely manner certain reports; (2) her failure to complete in a timely manner certain yearly appraisals of employees under her supervision; (3) her removal of an employee's time card from the premises, which in turn delayed the calculation of the employee's wages; (4) her taking home bills of lading, which in turn caused shipping delays; (5) her failure to transcribe minutes of a meeting she attended as the designated secretary; (6) her poor leadership; (7) her poor responsiveness to employees; (8) her poor orga-

nization; (9) her poor interpersonal skills; (10) her poor attendance; (11) her tardiness; (12) her inefficiency; (13) her failure to meet goals; (14) her failure to implement certain work improvements as directed by management; and (15) her failure to respond to certain requests. (*Id.* ¶ 9.)

With respect to her attendance, Honda asserts that Bush did not meet the mandatory 98% attendance rate it set for supervisors. (Edwards Aff, attached to Doc. # 12 at Ex. 2, ¶ 4; Bush Depo. at 63.) It refers to her proclivity for being absent from the job site as a "chronic" problem. (Smith Aff. ¶ 4.) Furthermore, on July 31, 1998, Bush's immediate supervisor, Donald Edwards, issued her a "final written warning" in which he reprimanded her for attendance issues. (Bush Depo. at Ex. M.) Bush responds to this charge by stating that her absences were excused by a physician's statement, and that such excused absences were not chargeable against her attendance record. (Bush Aff. ¶ 12; Bush Depo. at 63.) Bush also states that another supervisor, Rita Huff, a Caucasian, was not demoted despite having a worse attendance record. (Bush Aff. ¶ 11.) In her deposition, Bush acknowledges that this assertion is based on her own observations, and not on a review of an official work attendance record. (Bush Depo. at 272–73.)

Bush denies that she was a poor worker, contending that she met 100% of her work objectives. (Bush Aff. ¶¶ 13, 14.) In support of its position, Honda has attached a number of documents to Bush's Deposition, including work performance evaluations from recent years.[4] Honda apparent-

---

4. (Bush Depo. at Exs. A through AA.) Bush has made no objection to the introduction of these documents. Furthermore, Smith, the parts warehouse manager from August, 1997, to March, 2000, and Edwards, Bush's immediate supervisor from June, 1998, to November, 1998, have both sworn to the records' authenticity as regularly kept business records and to their own familiarity with the matters with which the documents are concerned. (Smith Aff. ¶¶ 1 & 2; Edwards Aff. ¶ 1.) Accordingly, the Court finds that these

ly rates its employees' performances twice a year, once as part of a yearly merit appraisal, and a second time as part of a yearly bonus appraisal. Employees are rated on individual criteria, and then an overall performance rating is given. The rating scale for both is a five-point scale, with the lowest rating ("1") being "unsatisfactory," a "2" being "fair," a "3" being "proficient," a "4" being "commendable," and a "5" being "exceptional." A review of Bush's annual performance appraisals for the years April 1, 1996, through March 31, 1997, and April 1, 1997, through March 31, 1998, reveals that Bush's overall performance was rated a "2," or "fair." (Bush Depo. at Exs. I, L, & R.) Her bonus appraisals for 1996 and 1997 also rated her as "fair." (Bush Depo. at Ex. R.) In 1998, her bonus appraisal rating was a "1," or "unsatisfactory." (Bush Depo. at Exs. P & R.)

Honda has also submitted memoranda highlighting particular deficiencies in her performance that were of concern to Honda management. In particular, the Court notes two documents related to the timeliness of the filings of several Incident Investigation Reports: Exhibits G and H, as attached to Bush's Deposition. The Incident Investigation Reports are work-related accident reports which Honda requires its supervisors to complete and file when employees under their supervision are injured in the workplace. Among other things, the reports are used to inform management that a job-related injury has occurred, and to assist the internal safety committee in its monitoring of workplace safety. (Bush Depo. at 87.) Honda's policy at the time was that if an accident necessitated that the employee seek treatment at a medical facility, an accident report was to be filled out "immediately." (*Id.* at 86.)

On October 23, 1997, an employee under Bush's supervision, Vicki Merical, sustained a broken foot at the parts warehouse. (*Id.* at Ex. H.) On November 12, 1997, not yet having received an accident report, an administrative assistant, Heather Jewart, wrote Bush a memorandum in which she asked her to complete and submit one. (*Id.* at Ex. G; *id.* at 100–01.) Bush completed her accident report of the incident on November 13, 1997. (Bush Depo. at Ex. G.) In light of the untimeliness of the filing of her report on Merical, and of the untimeliness of the filing of two reports concerning medical treatment that she had sought personally on two dates in October of 1997, Bush received a "written warning" memorandum from Smith on November 21, 1997. (*Id.* at Ex. H.) In the memorandum, Smith informed Bush that her delay with respect to the submissions of the accident reports was "not acceptable," and that her actions showed "poor leadership." Smith also informed her that any future occurrences of such might result in discipline or her dismissal.

■ With respect to her own medical treatment, Bush was unaware, prior to the November 21, 1997, memorandum, that she was responsible for submitting reports for her own medical treatment. (*Id.* at 104.) With respect to Merical, Bush contends that when Merical reported the accident to her, Merical laughed and said her foot was "fine." (*Id.* at 89.) According to Bush, Merical told her about the accident on a Friday,[5] and did not inform her that

documents are admissible as evidence. *See* Fed.R.Evid. 803(6) & 901.

5. The Court takes judicial notice that October 23, 1997, the reported date of Merical's accident, was a Thursday. If Bush learned of Merical's accident a day after it occurred, then her deposition testimony is consistent with the facts she reported in the accident report.

she was going to see a doctor until the following Monday. (*Id.* at 89–90.) Bush did not believe it was necessary to submit an accident report on the Friday she learned of the accident, given her understanding that such was only needed if an employee sought treatment at a medical facility. (*Id.* at 89.) Bush contends that upon learning, the following Monday, that Merical intended to seek a doctor's care, she filled out the accident report that day.[6] (*Id.* at 90.) Bush makes no attempt to reconcile her statement that she completed the accident report "the following Monday" with the uncontroverted evidence that she did not do so until November 13, 1997 (a Thursday, a full three weeks later).

Bush states that another supervisor, Tom Daly, a Caucasian male, was equally remiss in not filling out an accident report in 1997 or 1998. (Bush Aff. ¶ 18; Bush Depo. at 95.) Bush had reported a workplace accident to him, but instead of completing the report himself, he refused and delegated the responsibility to her. (Bush Depo. at 94–95.) Bush contends that the responsibility of completing the report was Daly's, but that on account of her taking it upon herself to do so immediately, the report was submitted on time. (*Id.* at 95.)

Her demotion lowered the "grade" at which Bush is employed, from grade 19 to grade 17. (Bush Aff. ¶ 39.) The upshot of this grade demotion is that the salary range of a grade 19 employee extends higher than does that of a grade 17 employee. (*Id.* ¶ 40.) Bush also contends that grade 19 employees are more likely to receive higher bonuses. (*Id.* ¶ 41.) That notwithstanding, Bush's immediate salary and benefits have not been decreased as a result of her demotion. (Smith Aff. ¶ 11.) Additionally, Honda points out that Bush

remains eligible for promotions, bonuses, and other benefits, and that it is purely speculative to think she would have received more had she remained in a grade 19 position, or that she will receive less as a result of her current status in a grade 17 position. (*Id.*)

## II. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

6. The Court takes judicial notice that "the following Monday" would have been October 27, 1997. In her Affidavit, by comparison, Bush states that she filed the report "[s]hortly after" receiving "confirmation" of Merical's injury. (Bush Aff. ¶ 17.)

(1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there

are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted,

specifically called to its attention by the parties.

## III. *Analysis*

Title VII prohibits an employer from discriminating against an employee, with respect to the terms, conditions, and privileges of one's employment, on the basis of sex. *See* 42 U.S.C. § 2000e–2(a)(1); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 63, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth a systematic paradigm for courts to analyze claims of discrimination brought pursuant to Title VII. In lieu of direct evidence of discrimination, which she has not adduced, the *McDonnell Douglas* framework requires Bush to establish a prima facie claim of discrimination at the outset. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory action. *Id.* "If the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. The ultimate burden of persuasion remains at all times with the plaintiff." *Newman v. Federal Express Corp.,* 266 F.3d 401, 405 (6th Cir.2001) (citations and internal quotations omitted).

■ To establish a prima facie claim of racial discrimination under Title VII, Bush must show that she (1) is a member of a protected class, (2) was qualified for the job from which she was demoted, (3) suffered an adverse employment decision, and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *See id.; see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff is able to make a prima facie showing of discrimination, she "in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted). In that case, the burden of producing evidence of a nondiscriminatory reason for the adverse decision falls on the defendant employer. *See id.* at 506–07, 113 S.Ct. 2742. This is merely a production burden, not a persuasion burden. *See id.* at 507, 113 S.Ct. 2742. In the event the defendant fails to meet its burden of production, the presumption created by the plaintiff's prima facie case requires a finding for the plaintiff. *See id.* at 506, 113 S.Ct. 2742. If, however, the defendant proffers such a justification, while an *inference* of discrimination may still be drawn from the plaintiff's prima facie evidence, the mandatory *presumption* of discrimination drops from the case. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). It then falls on the plaintiff to rebut the defendant's proffered justification by showing that it is mere pretext. Generally, the plaintiff can meet this burden in one of three ways. To raise a genuine issue of material fact about the credibility of his employer's explanation (i.e., to show pretext), the plaintiff must show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer to take the adverse action, or (3) that the proffered reasons were insufficient to motivate the taking of the adverse action. *See Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

The first method of rebuttal is a garden variety contest of the defendant's facts. *See id.* The second method of rebuttal is

based on a showing of pretext. There, the plaintiff, while conceding the truth of defendant's facts and even admitting that such facts otherwise allow for the adverse action, argues that the excuse was not the motivating factor in the defendant's decision. *See id.* In the third method of rebuttal, as with the second method, the plaintiff may concede the truth of the defendant's facts, but here the plaintiff offers evidence that such a fact, even if true, could not justify taking the action. This might be shown by evidence that other similarly situated employees engaged in the same action but suffered no adverse action. *See id.* It could also be shown, for example, by the existence of clear language in an employee handbook stating that such conduct is perfectly acceptable in the workplace.[7] In any of these events, if the plaintiff is successful in his rebuttal, a genuine issue of material fact is presented for the trier of fact.

■ In this matter, Honda attacks Bush's ability to make out the fourth factor of her prima facie case, arguing that she is unable to show that she was replaced by a person outside her protected

class or treated differently than others similarly situated.[8] Bush, on the other hand, argues that her claim of disparate treatment is demonstrated in both ways, to wit, by the fact that Huff and Daly were not demoted despite similar missteps in the workplace, and the fact that she was replaced in her position by Kennedy. (Bush Aff. ¶¶ 8, 11, 18.)

The second basis for Bush's argument can be dismissed readily. In *Clevidence v. Wayne Savings Community Bank*, 143 F.Supp.2d 901 (N.D.Ohio 2001), the plaintiff had brought an age and gender discrimination claim against her employer. Therein, to establish her prima facie case, the plaintiff alleged that she had been replaced by male employees following her termination. *Id.* at 908. The court declined to make such a finding, noting that the males to whom the plaintiff referred were merely other members of the plaintiff's former department who had been assigned to split her responsibilities, along with a temporary employee, in the immediate aftermath of her termination. *Id.* at 904, 908. As a permanent replacement, who was within the protected age and

---

7. In *Manzer*, the Sixth Circuit suggested that the third method of rebuttal is usually best demonstrated by evidence of the comparative treatment of similarly situated employees. 29 F.3d at 1084. A plaintiff is not constrained to make that showing, though, and the Court offers its second hypothetical to help focus on the critical distinction between the second and third rebuttal methods. In both, the plaintiff concedes the facts, for if he did not, the rebuttal would come within the first method. The difference between the second and third is that in the second, the plaintiff further admits that the facts could ordinarily provide sufficient grounds for the adverse action, while in the third, he argues that they could not.

8. An argument could also be made that the "terms, conditions, and privileges" of Bush's employment have not been affected by her demotion, such that she can show she has

suffered an "adverse employment action." As Honda has demonstrated, Bush's demotion has not resulted in the loss of any income or other benefits, including the opportunity to receive future bonuses or promotions. (Smith Aff. ¶ 11.) It is true that her pay scale has shifted downward, in that the potential maximum income she can make in a grade 17 position is less than that which she could make in a grade 19 position, but be that as it may, it would only be speculation at this point to think either that she would have reached the maximum income level at the grade 19 position, or, conversely, that she will never do so merely because she is currently in a grade 17 position. In any event, because Honda does not stress this point within the context of its argument on the merits of the discrimination claim, the Court need not determine whether this issue itself is dispositive.

gender classes, had been hired within a month of the plaintiff's termination, the court found that the plaintiff had failed to make out her prima facie case of discrimination.

The Court agrees with the rationale of *Clevidence* and finds that the facts and conclusions of that case are applicable to the current matter. The uncontested facts show quite clearly that Kennedy, a Caucasian, was not hired into the position of parts center supervisor on anything other than an interim basis. Furthermore, the uncontested facts show that a permanent replacement, Malki, had been hired by December, 1998, and that Malki is also an African–American. (*See* Smith Aff. ¶ 6.)[9] Since Bush did not dispute the fact that Malki was hired on a permanent basis, or that Kennedy was merely an interim replacement, she cannot make out her prima facie case on this ground. *See also Sheets v. National Computer Systems, Inc.*, 2000 WL 33364120 (S.D.Iowa Dec. 7, 2000) ("The limited case law in this area suggests the Court should look to the permanent replacement employee, not the temporary fill-in.") (citing *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir.1989), *cert. denied*, 495 U.S. 935, 110 S.Ct. 2180, 109 L.Ed.2d 508 (1990), and *Ashagre v. The Southland Corp.*, 546 F.Supp. 1214, 1219 (S.D.Tex.1982)).

■■■ With respect to Bush's argument that discrimination can be inferred from the fact that she was demoted while Daly and Huff were not, the Court is presented with an interesting question. Bush argues that Daly and Huff both engaged in certain conduct similar or identical to that of which Honda accuses her. Specifically, with respect to Daly, Bush argues that he, too, failed to complete a necessary accident report, yet was not demoted. With respect to Huff, Bush argues that she had a worse attendance record than her own, yet was not demoted. Honda disagrees with Bush's assessment of Daly's and Huff's respective performances, but, in any event, argues that because Bush was demoted for a whole host of reasons, even if other employees may have been guilty merely of individual derelictions, they were not similarly situated. The interesting question, then, is whether a proper analysis of whether others are "similarly situated" may include, *at the prima facie stage*, the consideration of the facts underlying the reasons proffered by the employer for why it demoted the employee (e.g., poor performance), or whether such a consideration must be put off until the rebuttal stage of the *McDonnell Douglas* analysis. In other words, can the plaintiff's ability to make out a prima facie showing that she was similarly situated to other, non-protected employee's be defeated merely by her employer's recitation of a legitimate, non-discriminatory justification for its actions, or must the Court first examine whether the facts underlying said justification are in dispute, and then discount, for purposes of the prima facie analysis alone, any such disputed facts?

■■■ "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employ-

9. It is not clear from the record whether Malki was, officially speaking, the replacement for Bush or Huff. Of course, neither is it clear that Kennedy was Bush's interim replacement any more than he was Huff's. Honda simply had two supervisor positions open, apparently of identical description. In any event, the second opening was permanently filled by January, 1999, by Pope, also an African–American. As such, the Court's finding is the same: Bush's permanent replacement, hired, at the latest, within two months of her demotion, was African–American, thus defeating her prima facie case on this ground.

ees, the plaintiff must show that the 'comparables' are similarly situated *in all respects." Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) (citing *Stotts v. Memphis Fire Dept.*, 858 F.2d 289 (6th Cir.1988))(emphasis in original). As the *Mitchell* court observed, "to be deemed 'similarly situated[,]'[ ] the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject tò the same standards[,] *and have engaged in the same conduct* [,] without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citation omitted)(emphasis added). Importantly, however, although the language of *Mitchell* "appears to invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment, [it] has not been so narrowly construed." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998). By "all respects," the *Mitchell* court meant all *relevant* respects. *See id.* As such, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated.' " *Id.*

*Mitchell* makes clear that the relative conduct of a plaintiff is relevant in making a determination of whether others were similarly situated. Yet, to entertain the merits of the employer's legitimate, nondiscriminatory justifications at the prima facie stage would potentially require Bush to advance at that juncture her third stage rebuttal argument, thus defeating the role of the tripartite analysis engendered by *McDonnell Douglas.*

To address this question in its proper perspective, the Court finds it helpful to reflect once again upon the methods by which a plaintiff may rebut the defendant's proffered nondiscriminatory justification for taking the adverse action, as they were stated by the *Manzer* court. If the plaintiff were to attack the legitimacy of the defendant's justification under the second or third method suggested by that court, and thus acknowledge the truth of the underlying facts, then it would be proper for the court to consider the underlying facts at the prima facie stage, as they would not be in dispute. However, if the plaintiff were challenging the underlying facts giving rise to the defendant's nondiscriminatory justification, then before the Court could consider the employer's stated reasons in making its findings as to whether the plaintiff was similarly situated to other employees, it would be necessary to make a determination of whether there existed a genuine issue of material fact with respect to these stated reasons. This is exactly the sort of analysis which the Court is to undertake at the rebuttal stage, or third stage, pursuant to *McDonnell Douglas;* to graft this analysis onto the prima facie stage would be to enlarge the plaintiff's initial burden from minimal, *see Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir.1999), to something more substantial, and to blur, if not outright obliterate, the *McDonnell Douglas* framework.[10]

To be sure, the case law of the Sixth Circuit demonstrates that the differences between the alleged conduct of the plaintiff and that of other employees may be considered at the prima facie stage when de-

**10.** The alternative would be to hold that the tripartite analysis does not apply where a plaintiff is contesting the truth of the facts underlying the defendant's justification, pursuant to the first method of rebuttal an-

nounced in *Manzer.* In such an event, a motion for summary judgment analysis would precede like any other, and the Court would assess whether genuine issues of material fact existed without regard to shifting burdens.

termining whether the respective employees were similarly situated. As noted, *Mitchell* expressly avows that such a comparison is proper. Indeed, *Mitchell* addresses the point head on, stating that the first question to ask when comparing the alleged conduct of various employees is whether the respective conduct was of "comparable seriousness." 964 F.2d at 583. However, a review of the case law reveals the very distinction suggested above: relative conduct may be considered in those instances where the plaintiff does not draw the underlying facts into dispute (i.e., where the plaintiff's argument on pretext has been revealed to be that of either methods two or three).[11]

For example, in *Mitchell*, the plaintiff was purportedly discharged for hiding welfare billing forms and lying to her boss about it. 964 F.2d at 580, 583. As part of her prima facie argument, she had accused other employees of absenteeism and insubordination. *Id.* at 580. The court noted, however, that the plaintiff had failed to make a showing that the acts of which she accused others were of "comparable seriousness" to the acts for which she was discharged. *Id.* at 583. Of significance is that the plaintiff did not dispute that she had committed the acts of which she was accused. *Id.* at 580. Her claim was based not on the falsity of her employer's accusations, but on her allegations that others had engaged in conduct of comparable ser-

iousness and yet had not been discharged. *Id.* This is the sort of rebuttal argument that can be categorized under *Manzer* as one where the plaintiff challenges not the underlying facts of the employer's nondiscriminatory justification, but its sufficiency to support its actions. *See* 29 F.3d at 1084. As noted above, in such a situation, as there would be no need to engage in a fact-finding analysis at the third stage of the *McDonnell Douglas* framework as far as the veracity of the facts underlying the employer's justification is concerned, there would be no harm in considering the conduct of the plaintiff, as ascribed to him by the employer, at the prima facie stage.

■ Succinctly put, the example provided in *Manzer* concerning a plaintiff's ability to show that his employer's proffered reasons were insufficient to justify the adverse action by showing evidence that other "similarly situated" employees were not so acted upon (i.e., *Manzer's* third method of rebuttal) does not apply to *a prima facie analysis* of whether some employees were "similarly situated." To demonstrate that a plaintiff was "similarly situated" to others for the purposes of making out a prima facie argument, she need not demonstrate that the others to whom she compares herself also committed the same derelictions of which she is accused, *if she disputes those accusations.* If she were so required, the *McDonnell Douglas* tripartite paradigm would be a muted doctrine.

---

11. Obviously, a plaintiff need only proffer a rebuttal argument if the defendant has first proffered nondiscriminatory reasons for taking the adverse action against the plaintiff (i.e., *McDonnell Douglas* stage two). What is more, the Court is obviously not suggesting that the plaintiff's rebuttal argument should be considered at the prima facie stage any more than the defendant's proffered nondiscriminatory justifications. All the Court is suggesting is that upon a complete reading of the plaintiff's response brief to defendant's motion for summary judgment, it should be

obvious how the plaintiff intends to respond to the defendant's nondiscriminatory justifications (provided there are some). When it becomes clear that the plaintiff's method of rebuttal will take the form of *Manzer's* method one, the Court should leave any consideration of the disputed facts to the third stage. This analysis is consistent with that employed in the Sixth Circuit when entertaining questions of disputed facts related to the plaintiff's qualifications for the job (i.e., prima facie factor two). *See infra* note 12 and accompanying text.

The prima facie analysis is less searching, as *Manzer* itself demonstrates. Therein, the court noted that the plaintiff, who had been terminated by his employer, had made a sufficient prima facie showing that he was qualified for the job from which he was discharged (i.e., the second prima facie factor). 29 F.3d at 1082. Nevertheless, when it came time to rebut his employer's purported nondiscriminatory basis for terminating him, his prima facie evidence was not strong enough by itself to show he was qualified enough to retain his job. *Id.* at 1084–85. There is no sound reason for the Court not to employ herein the same logic in addressing the "similarly situated" factor (i.e., the fourth prima facie factor).[12]

With this in mind, the Court must look at how Bush responds to the acts or omissions ascribed to her by Honda. Where Bush has not conceded that she engaged in such conduct, but instead argues that she did not, then the Court shall leave its analysis of the competing positions until the third stage. On the other hand, as demonstrated by *Mitchell,* conduct which Honda attributes to Bush which Bush does not contest, may be considered in determining whether the respective employees were similarly situated. In any event, the Court should not get overly caught up in

12. *See also United States Postal Service Bd. of Govs. v. Aikens,* 453 U.S. 902, 906, n. 2, 101 S.Ct. 3135, 69 L.Ed.2d 989 (1981) (Marshall, J., dissenting) (opining that proof of relative qualifications should be considered at the rebuttal stage of the Title VII analysis, and not at the prima facie stage). The Sixth Circuit, also, has frequently repeated that a prima facie showing of a plaintiff's qualifications need only be enough to demonstrate that the plaintiff meets the legitimate, *objective criteria* established by the employer. *See Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 731–32 (6th Cir.2000) (" '[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.' ") (quoting *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 660–61 (6th Cir. 2000)); *Cline, supra* (quoted in *Hoskins, supra;* stating that any consideration of the employer's stated nondiscriminatory reason for taking the adverse action against the plaintiff is "required" by *McDonnell Douglas* to be considered at the rebuttal stage); *Gafford v. General Elec. Co.,* 997 F.2d 150, 167, n. 9 (6th Cir.1993)(rejecting the proposal to require a plaintiff to show, at the prima facie stage, that he was "as qualified" as other candidates or employees); *Brown v. Tennessee,* 693 F.2d 600, 603, n. 5 (6th Cir.1982) (plaintiff's proof must only support "the conclusion that the plaintiff was qualified according to the legitimate criteria disseminated by the company or as found by the district court"). *See also* *Lynn v. Regents of the Univ. of Calif.,* 656 F.2d 1337 (9th Cir.1981). Two commentators have noted recently that the majority of courts have tended not to require such a heightened level of proof at the prima facie stage, instead leaving the "real analysis" for the third stage. David N. Rosen & Jonathan M. Freiman, *Remodeling McDonnell Douglas: Fisher v. Vassar College and the Structure of Employment Discrimination Law,* 17 Quinnipiac L.Rev. 725, 754 (1999).

If it is true, as the case law makes clear it is, that making a comparative analysis of an employee's qualifications at the prima facie stage conflates the stage one (prima facie) and stage three (rebuttal) analyses, then it is equally true that using an employer's purported justifications for the purpose of comparing the similarities of a plaintiff's situation to those of her fellow employees conflates the two. In both cases, the court must either weigh the competing evidence or simply assume *arguendo* the veracity of the defendant's assertions. Under either approach, the *McDonnell Douglas* framework is jeopardized: in the first approach, the plaintiff's prima facie argument gets conflated with its rebuttal argument; in the second approach, by assuming the truth of the defendant's assertions, an employer is encouraged to think up as many excuses for taking the adverse action against the plaintiff as its imagination might allow in order to decisively isolate the plaintiff's "situation" from that of other employees, which in turn prevents the plaintiff from ever getting to its rebuttal.

analyzing merely the similarities of the respective employees' conduct. Preliminarily necessary to the equation is its analysis of the similarities of the employees' respective duties and responsibilities. After all, the standard by which the conduct of employee A in department X is judged may not be the standard by which the conduct of employee B in department Y should be judged. *See, e.g., Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 732 (6th Cir.2000) (finding that plaintiff could not make a prima facie showing of gender discrimination where facts showed that others identified by plaintiff as "similarly situated" had different job functions and responsibilities and therefore could not be held to the same standards of conduct).

██ The answer comes easily with respect to Daly. Regardless of the similarity of their conduct, the Court has not been presented with any facts which might lead to a finding that Daly and Bush were similarly situated in terms of their job responsibilities, the supervisors to whom they reported, or the type or number of employees whom they oversaw. The Court has no independent knowledge of the Troy parts warehouse or of the various functions undertaken there, and if parties, Bush in particular, do not bring such to its attention, it is impossible to glean an understanding of same. All the Court knows is that Daly was, as was Bush, a "supervisor." Out of context, the Court has no conception of whether that means they were similarly situated. Bush argues that Daly was required to fill out accident reports just as she was, but submits only hearsay statements to support the truth of this assertion. (*See* Bush Depo. at 95, 97.)

That is not admissible evidence that their roles at the warehouse were similar. As it is impossible for the Court to discern whether Daly and Bush were similarly situated with respect to their basic employment roles, Daly does not provide a benchmark by which Bush can make out a prima facie case of discrimination.[13]

With respect to Huff, Bush alleges that Huff had a "worse attendance record" than she, but was not subjected to demotion. (Bush Aff. ¶ 11.) This allegation is made on the basis of her own observations, and not on an examination of actual employee attendance records. (*See* Bush Depo. at 272–73.) The Court finds that although personal observations are all that Bush has utilized in forming her opinion, an employee's daily observations of the presence or absence of another employee with whom the first employee works is legitimate, first-hand evidence of the second employee's attendance tendencies, and in this instance gives rise to a genuine issue of material fact as to whether Huff's attendance was significantly different than that of Bush's. Furthermore, unlike with Daly, Honda itself acknowledges, at least implicitly, that Bush and Huff occupied identical supervisory positions and answered to the same supervisor. (*See* Smith Aff. ¶ 5; Doc. # at 24 (stating that "[a]side from Plaintiff and Rita Huff, there were a total of four Supervisors in Plaintiff's department immediately prior to Plaintiff's demotion").) Thus, from purely a job classification perspective, Bush and Huff are identically situated, and an initial inference may be drawn that they were not treated equally with respect to attendance.

Regarding the remaining conduct, Honda makes it clear that Bush was demoted

---

**13.** Even if it were clear that Daly had a duty to fill out accident reports and was otherwise similarly situated to Bush, the ironic fact remains that through the initiative of Bush, the accident report to which she refers was completed and submitted in a timely fashion. (*See* Bush Depo. at 95.) The comparison to Daly is simply not well taken.

for "a combination of factors." (Smith Aff. ¶ 9; Edwards Aff. ¶ 5.) The existence of these other factors, which Honda contends did not exist with respect to Huff, does not alter the Court's finding that Huff and Bush were similarly situated. Bush expressly disputes Honda's claim that she failed to complete accident reports in a timely fashion (Bush Aff. ¶¶ 16 & 17), argues that she removed an employee's time card from the premises only inadvertently, and promptly returned it when it was brought to her attention (*id.* ¶ 19), and generally denies that she was a poor worker. (*Id.* ¶ 14.) Additionally, she contends she met "100% of [her] work objectives." (*Id.* ¶ 13.) These express and general statements go to the veracity of the facts underlying the other purported reasons for her demotion. For reasons stated, the Court finds that the arguments posed by these statements are properly considered as rebuttal, and should not be considered at the prima facie stage to differentiate Bush from Huff. Accordingly, because Honda proffers no argument that the other three prima facie factors are not met in this instance, to wit, that Bush is a member of a protected class, was qualified for the position from which she was demoted,[14] and suffered an adverse employment action, the Court finds that Bush has established a prima facie case of discrimination necessitating a more detailed exploration of the purported reasons for her demotion.

█ That Bush has made out a prima facie case of discrimination does not save her cause of action, however, as her rebuttal arguments are insufficient to create a genuine issue of material fact with respect to the purported reasons for her demotion. To begin with, it is Honda's burden to "clearly set forth, through the introduction

of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. Honda has done this.

As noted above, a review of Bush's annual performance appraisals for the years April 1, 1996, through March 31, 1997, and April 1, 1997, through March 31, 1998, reveals that Bush's overall performance, on a scale from "1" to "5," was rated a "2," or "fair." (Bush Depo. at Exs. I, L, & R.) Her bonus appraisals for 1996 and 1997 also rated her as "fair." (Bush Depo. at Ex. R.) In 1998, her bonus appraisal rating was a "1," or "unsatisfactory." (Bush Depo. at Exs. P & R.) Furthermore, on November 21, 1997, Bush was issued a written warning from the warehouse manager, Smith, reprimanding her for not completing certain accident reports on time. (Bush Depo. at Ex. H.) On July 31, 1998, Bush was issued a "final" written warning from her immediate supervisor, Donald Edwards, reprimanding her for poor attendance and a "lack of improvement" in her overall supervisory performance. (Bush Depo. at Ex. M.) On November 11, 1998, Smith issued a memorandum to Bush informing her that, based on her recent performance appraisals, she would be reassigned to a grade 17 position.

Factors purportedly playing a role in both her performance appraisals and her demotion, as stated by both Smith and Edwards in their respective Affidavits, in addition to her attendance record and failure to complete certain accident reports on time, include her failure to complete in a timely fashion performance evaluations of employees under her supervision, the unauthorized removal of an employee's time card and certain bills of lading from the work premises, her failure to transcribe

---

**14.** "Qualified" in this context, as noted *supra* at note 12, connotes an existence of basic qualifications, without regard to Bush's purported deficiencies which allegedly prompted her demotion.

the minutes of a meeting for which she had been assigned the secretarial duties, and her failure to implement certain work improvements within her department. (Smith Aff. ¶ 9(b), (c), (d), (e), (f), (o), & (p); Edwards Aff. ¶ 5(b), (c), (d), (e), (f), (o), & (p).) Other, arguably subjective, factors include her poor leadership skills, her poor organizational skills, her inefficiency, and her inability to work well with her personnel and others. (Smith Aff. ¶ 9(g), (i), (j), & (m); Edwards Aff. ¶ 5(g), (i), (j), & (m).)

These are all legitimate, nondiscriminatory reasons for Honda to take an adverse action against Bush. "[C]ourts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions," *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir.2002); *accord Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991), and unless Bush can present evidence of racial animus, the Court will not overturn an employment decision, even if the Court might have acted differently had it been the employer. *See, e.g., Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991); *Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir.1986); *Jones v. Delphi Packard Elec. Sys.*, 208 F.3d 213, 2000 WL 282896 (6th Cir.2000); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 43 (2nd Cir. 2000); *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 637 (8th Cir.2000).

■ Bush does not address Honda's claims that she failed to complete performance appraisals of those under her supervision in a timely manner, that she removed bills of lading from the premises, that she failed to transcribe the minutes of a meeting in a timely manner, or that she failed to implement certain improvements in the workplace for which she was responsible. The only statements which may be taken as attempts to cast doubt on these claims are her assertions in her Affidavit that she met 100% of her work objectives and that she, in her own opinion, did not perform poorly. (Bush Aff. ¶¶ 13 & 14.) Again, however, absent a showing of discriminatory intent, the Court is not here to second guess legitimate employment decisions made by employers such as Honda. As the Sixth Circuit has held, to show that the employer's legitimate, non-discriminatory explanation is pretextual, "[a] plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir.1999) (quoting *Manzer*, 29 F.3d at 1083).

With respect to her purported failure to complete accident reports in a timely manner, the undisputed record shows that Bush neglected to submit such on three separate occasions. While she stated in her deposition that she was not aware that she was responsible for submitting accident reports for her own medical treatment, a plea of ignorance of one's duties does not rebut the charge that the reports were not submitted in a timely fashion. The record also puts beyond dispute the fact that she was late in submitting the accident report for Merical. Despite the statement in her Affidavit that she submitted the report "shortly after" learning of Merical's injury, Bush acknowledged the authenticity and accuracy of the contents of her report (Bush Depo. at 106; *id.* at Ex. H) which clearly demonstrates that the report was not filed until three weeks after the date of Merical's injury. Given that Honda's policy, as acknowledged by Bush, was that reports be filed "immediately," there can be no doubt that it was not so filed after Merical's injury date of

October 23, 1997. (*See* Bush Depo. at 86–87.)

With respect to the issue of Bush's removal of an employee's time card from the premises, and her argument that her action was inadvertent, again, the fact that she may not have purposefully taken the card is immaterial. The fact is, she did, and the Court is not in a position to tell Honda that this is not something it may not consider when making a decision on whether to demote an individual. Neither does the fact that Honda purportedly considered this factor in its decision to demote her create an inference of discrimination.

Regarding the issue of Bush's attendance record, it is here that Bush comes closest to raising a genuine issue of material fact as to whether *she* had an attendance problem. Bush claims her absences were excused by her doctor and therefore may not be counted against her under "Honda's established policy." (Bush Aff. ¶ 12.) Unfortunately for Bush, because she presents no evidence on the subject, the Court is unaware of what Honda's "established policy" is (or was) on this point. Perhaps more importantly, the Court is not convinced that such a fact would matter even if Bush were correct. "The factfinder may not focus on the soundness of the employer's business judgment." *Wilkins,* 790 F.2d at 521. As her 1998 bonus appraisal and the "final written warning" of July 31, 1998, indicate, her supervisor, Edwards, definitely perceived an attendance problem, even if there were none. (Bush Depo. at Ex. P; Edwards Aff. ¶¶ 1, 3, 4, 5(k), & 6.)

Additionally, although it was enough to raise a prima facie showing of disparate treatment, the fact that Huff may have had an attendance problem of her own does not overcome Honda's showing that it acted in a legitimate manner toward Bush. As is evident by now, Bush had far more

factors militating against her than just that of attendance, and she has not shown that Huff was similarly situated under the more detailed analysis appropriate at this stage of the *McDonnell Douglas* analysis. *See Manzer,* 29 F.3d at 1084. Put simply, Bush's assertion that Huff, too, had an attendance problem is inconsequential, given that she (Bush) has not adduced facts tending to show that she and Huff were "similarly situated *in all respects.*" *Mitchell,* 964 F.2d at 583 (emphasis in original).

■ Bush also argues that some of the other "criticisms," such as Honda's claims that she was a poor leader, showed poor organizational skills, that she had personnel problems, and that she was inefficient, should be discounted because of their subjective nature. (Doc. # 14 at 17.) In this regard, the Court observes that "the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority." *Grano v. Department of Development of the City of Columbus,* 699 F.2d 836, 837 (6th Cir.1983). However, "the mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case." *Daniels v. Board of Educ. of Ravenna City School District.,* 805 F.2d 203, 208 (6th Cir.1986) (citation omitted).

■ In this instance, by characterizing Honda's claims as "subjective," Bush is merely attempting to get a second bite at the apple. These "subjective" criteria are mere distillations flowing from the objective facts already observed. If one fails to do certain things which are required of her as a supervisor, then residual comments such as "poor leadership" or "poor organization" are naturally going to follow.

Where there is an objective basis for subjective-sounding comments, and the objective basis has not been countered by a showing of discriminatory motive, then there is no harm to be found in the subjective comments themselves. This is particularly true where the evidence shows, as it does in this case, a history, dating back at least a few years, of poor annual performance reviews and consistent dissatisfaction on the part of her supervisors. As the Fourth Circuit has observed, "Title VII [does not] require an employer to adopt a life of economic altruism and thereby immunize protected class members from discharge or demotion despite their poor performance and inadequate qualifications." *Gairola v. Commonwealth of Va. Dept. of General Servs.*, 753 F.2d 1281, 1287 (4th Cir.1985).

 Finally, Bush argues that her performance appraisal ratings were unfairly low, that her salary was in the lower third of supervisor salaries, that she was denied opportunity to attend management training classes, and that Honda failed to provide her with a sufficient number of employees to do her job adequately. (Bush Aff. ¶¶ 23, 32, 33, & 34.) With respect to her performance appraisal ratings, as already suggested, Title VII does not require a court to conduct an independent review of a plaintiff's work history to reach its own conclusion as to her ability, and the Sixth Circuit has made it clear that poor performance evaluations, at least when taken alone, cannot constitute the basis for Title VII complaints. *E.g., Morris v. Oldham County Fiscal Court*, 201 F.3d 784,

789 (6th Cir.2000); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999) ("If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure.").

With respect to the other three contentions, the Court finds them unsupported by the evidence. Even if true, without more, the fact that her salary is lower than other supervisors is of no moment. To make anything of this contention, she would have to show that her salary is undeservedly lower than that of others who are similarly situated when considered in light of all of the details of the respective employees' employment histories and records. Likewise, whether she was provided with proper resources or training opportunities would only be probative to her discrimination action, with its focus on her demotion, if she could show others similarly situated were provided with such opportunities. She has not done this.

 Upon its review of the submissions of parties, the Court is unable to find any evidence of discriminatory intent on the part of Honda, or to draw an inference of such.[15] Under any of the three methods of rebuttal suggested by the *Manzer* court, 29 F.3d at 1084, Bush is unable to raise a genuine issue of material fact. She has failed to show that Honda's facially nondiscriminatory justifications for demoting her were factually false, that they were insufficient to justify a demotion, or that another,

---

15. Furthermore, while the Court may not draw inferences adverse to the non-moving party when ruling on summary judgment, because it has already found that no reasonable inferences can be drawn in support of Bush's claim, it is telling to note, for non-evidentiary purposes, that a similarly situated Caucasian supervisor was demoted on the same day by the very same management team, that an African–American manager was part of the demotion decision-making team, and that the next two, and four of the next five, individuals to fill the supervisor position equivalent to that which Bush formerly occupied were African–American. (Smith Aff. ¶¶ 6–10.)

discriminatory, reason provided the true underlying motive for her demotion.[16]

Given that Bush has not raised a genuine issue of material fact as to whether Honda's purported reasons for demoting her were either false and/or pretextual, Honda's Motion for Summary Judgment shall be SUSTAINED with respect to the Title VII cause of action (Third Cause of Action). Additionally, as the Ohio Supreme Court has generally interpreted Chapter 4112 of the Ohio Revised Code in conformity with the federal standards of Title VII, *see Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981), Honda's Motion is SUSTAINED with respect to Bush's state law claim of discrimination (Fourth Cause of Action) for the same reasons, as that claim is based on the same set of facts.

 Ohio does not recognize negligent infliction of emotional distress as a cause of action where the basis is the termination of one's employment. *See Dunlap v. General Motors Corp.,* 221 F.3d 1334, 2000 WL 799788 (6th Cir.2000). Regarding intentional infliction of emotional distress, a claim for such will exist where

"[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (citing Restatement (Second) of Torts § 46(1) (1965)). The Ohio Supreme Court has stated that "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!," and "[t]here is no occasion for the law to intervene in every case where some one's [sic] feelings are hurt." *Id.*

 This case is not about outrageous conduct. The facts that Bush was demoted against her will and that she continues to see a psychologist whom she had been seeing prior to her demotion (Bush Aff. ¶ 27) do not create genuine issues of material fact with respect to the "outrageous-

**16.** In her Affidavit, Bush states that Honda has resisted hiring minority applicants, lacks a minority presence in its management, resists hiring minorities into its college program, and has placed insufficient numbers of minorities in its office positions. (Bush Aff. ¶¶ 35–38.) Although Bush does not appear to offer a disparate impact theory of liability in her brief, these statements in her Affidavit are suggestive of as much. The Court will address the matter in this footnote. "Under the disparate impact theory, a plaintiff must produce evidence demonstrating that the employment practice in question selects applicants for employment, reemployment or promotion in a racial pattern which is significantly different from the general pool of applicants." *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.,* 690 F.2d 88, 93 (6th Cir.1982) (citation omitted). In this case, Bush has

failed to present *any* evidence supporting her Affidavit assertions, which, in this case, are insufficient to create an inference of a disparate impact. Moreover, Honda has submitted uncontroverted evidence to the contrary. Smith states in his Affidavit that one of the Senior Managers at the warehouse when Bush was demoted, Frederick Toney, is African–American. (Smith Aff. ¶ 10.) Four of the next five individuals to follow Bush in her supervisor's position were African–American. (*Id.* ¶¶ 6–8.) The Court has no knowledge of the number of employees at the parts warehouse where Bush worked, and Bush has submitted no evidence on the matter. On the basis of the evidence submitted by Honda, and the total lack thereof by Bush, it is impossible to find, or even infer, that Honda's employment practices have a disparate impact on racial minorities.

ness" of Honda's actions or to the existence of severe and debilitating emotional distress in Bush *resulting from* her demotion. Accordingly, Honda's Motion is SUSTAINED with respect to the emotional distress count (First Cause of Action).[17]

■■■■■ The intermediate appellate courts of Ohio have recognized a cause of action for negligent hiring, retention, and entrustment.[18] In such an action, the plaintiff must prove "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *See Steppe v. Kmart Stores*, 136 Ohio App.3d 454, 737 N.E.2d 58, 66 (1999). Bush has not raised a genuine issue of material fact with respect to elements (2) through (5) of this count (Second Cause of Action). Accord-

ingly, on this count, too, Honda's Motion is SUSTAINED.

## IV. *Conclusion*

For the reasons and citations to authority set forth above, the Court finds Defendant's Motion for Summary Judgment well taken, and it is hereby SUSTAINED. Judgment is ordered entered in favor of the Defendant, and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

17. Indeed, as articulated by the Sixth Circuit with respect to employment termination:

> But an employee's termination, even if based upon discrimination, does not rise to the level of "extreme and outrageous conduct" without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress. *See Baab v. AMR Services Corp.*, 811 F.Supp. 1246, 1269 (N.D.Ohio 1993) ("To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."); *Bryans v. English Nanny and Governess Sch., Inc.*, 117 Ohio App.3d 303, 690 N.E.2d 582, 592 (1996) (holding that even if the plaintiff-student proved her claim of discrimination on the basis of disability, the school's conduct was "not so extreme or outrageous as to be intolerable in a civilized community").

*Godfredson v. Hess*, 173 F.3d 365, 373 (6th Cir.1999); *see also Black v. Columbus Public Schs.*, 124 F.Supp.2d 550, 588 (S.D.Ohio 2000); *Stoklosa v. Consolidated Rail Corp.*,

864 F.2d 425, 426 (6th Cir.1988); *Francis v. Gaylord Container Corp.*, 837 F.Supp. 858, 864 (S.D.Ohio 1992).

18. The Ohio Supreme Court case typically cited by lower courts as recognizing the tort is *Ruta v. Breckenridge–Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982). There the court stated, at 938:

> We are not called upon to decide whether the Court of Appeals correctly defined the essential components of the tort of negligence in hiring or retention, or even whether that tort is recognized in Ohio as the basis for a cause of action separate and distinct from other recognized theories of recovery, such as negligent entrustment and respondeat superior. What we are asked to decide is if the Court of Appeals required plaintiffs to introduce sufficient proof that Decker was dishonest to avoid a directed verdict, in addition to requiring proof of the other five elements, which the parties and the courts below assumed constituted a recognized tort.