[Cite as *Miller v. Potash Corp. of Saskatchewan, Inc.*, 2010-Ohio-4291.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

JOHN W. MILLER, JR.,

     **PLAINTIFF-APPELLANT,**            **CASE NO. 1-09-58**

     **v.**

POTASH CORPORATION OF
SASKATCHEWAN, INC., ET AL,          **O P I N I O N**

     **DEFENDANTS-APPELLEES.**

**Appeal from Allen County Common Pleas Court
Trial Court No. CV 2008 0863**

**Judgment Affirmed**

**Date of Decision:   September 13, 2010**

**APPEARANCES:**

    *Ann-Marie Ahern* **for Appellant**

    *Kevin E. Griffith and Franck G. Wobst*  **for Appellee**

**WILLAMOWSKI, P.J.,**

{¶1} Plaintiff-Appellant, John W. Miller, Jr., ("Miller"), appeals the judgment of the Allen County Court of Common Pleas granting summary judgment in favor of Defendants-Appellees, Potash Corp. of Saskatchewan, Inc., et al. Miller contends that there were genuine issues of material fact entitling him to a trial on his claims of age discrimination. For the reasons set forth below, the judgment is affirmed.

{¶2} Miller filed a complaint against Potash Corp. of Saskatchewan, Inc. ("PCS"), and several other companies and individuals affiliated with PCS (hereinafter, collectively "Appellees"), claiming they discriminated against him based on his age, in violation of R.C. 4112.02(A), when they failed to hire him for a position in their new organization. Miller was born on July 19, 1958. In 1979 he began employment at the chemical plant located at Ft. Amanda Road in Lima Ohio ("the Plant"). When Miller was first hired, the facility was owned and operated by Sohio and was later acquired by BP Lima Chemicals. Several more changes in ownership and operating structure occurred at the Plant during the years Miller worked there.

{¶3} In 2007, defendant PCS Nitrogen Ohio, LP ("PCSNO"), owned the Plant; however, it was operated by INEOS USA ("INEOS") pursuant to an operating agreement between PCSNO and INEOS. During 2007, Miller was an employee of INEOS, as was the entire hourly workforce at the Plant. In March

2007, INEOS notified PCSNO of its intent to terminate its obligation to continue operating the plant, effective December 31, 2007. PCSNO did not want to close the facility, so it decided to operate the Plant itself and hire its own workforce.

**{¶4}** Defendant Don Johnson ("Johnson"), who was age 61 at the time, was one of only five persons at the Plant who were employed by PCSNO in 2007. Johnson had been employed as a general manager and was selected by PCSNO to take a leadership role in guiding PCSNO through the transformation. Johnson then asked Todd Sutton ("Sutton") to join PCSNO and assist Johnson in forming the new organization. Sutton, then 37 years old, was an INEOS-employed chemical engineer who had worked at the Plant his entire professional career, working in various units and holding several supervisory positions during his 15 years of employment. Danielle Good ("Good") was hired in August 2007 as a human resources manager to coordinate the hiring process for the new PCSNO-operated facility.

**{¶5}** Johnson and Sutton testified that they had become very frustrated by the working conditions and attitudes that had developed at the Plant over the years, including a poor working relationship between hourly employees and management and a rigid organizational structure. They felt that the Plant's operating areas and units were overly segmented and rigid and some of the INEOS chemical operators had become too "silo-ed," which meant they were often unwilling or reluctant to perform work tasks outside their own current bid job even though they were well

trained and qualified to do so. They saw PCSNO's decision to hire its own workforce as a "very unique opportunity to make some key operational and organizational changes, and to make a fresh start at the facility ***." This was a "once-in-a-plant-lifetime opportunity" to change the working culture and get rid of the negative and corrosive "BP/INEOS heritage." They worked on developing new organizational structures, policies and approaches along with new "expectations" for employees.

{¶6} Miller and his fellow chemical operators learned that their current employer, INEOS, would cease operating the plant and they would be required to apply for positions with the new PCSNO organization. Those who applied but were not offered positions with PCSNO would be offered severance packages. The severance pay benefit ranged from two months of pay for employees with less than three years credited service, up to 16.5 months of pay for employees with 30 or more years of service. Based upon his 28 years of service, Miller was entitled to receive 16 months of severance pay if he applied for, but did not receive a job offer. It was mandatory to apply for a job with PCSNO in order to receive a severance package, so all of the INEOS employees applied. However, many of the older INEOS employees had told Sutton or Johnson that they did not want jobs with the new organization but had applied in order to be eligible for the severance package.

{¶7}   After reviewing the applications, conducting interviews, and making determinations as to which employees would best meet the needs of the new PCSNO organization, Appellees offered employment to 49 of the 72 former INEOS chemical operators plus several additional employees who were not operators.[1]   Miller, who was 49 years old at the time, was among the 23 chemical operators[2] who were not offered employment with the new organization.

{¶8}   Miller maintains he should have been offered a position with PCSNO because he was a loyal, committed, capable and experienced operator who had received positive job reviews and earned numerous awards for outstanding job performance and safety-conscious behavior.  Miller charges that Sutton and PCSNO created a new, younger culture, ridding themselves of some of the oldest and most experienced operators in the Plant.

{¶9}   Miller was qualified to perform in several different operator roles and had constantly trained and tested to maintain his qualifications and licensures. In contrast, he claims that the eleven operators newly hired by INEOS in

---

[1]These 72 employees included 61 chemical operators that had been employed by INEOS throughout 2007 and during prior years, and 11 chemical operators that had been newly hired by INEOS and had just started working at the Plant in September 2007.  INEOS had stopped hiring new chemical operators, and Johnson realized that additional operators would be needed if PCSNO was to be able to safely run the Plant effective January 1, 2008.  Johnson asked INEOS to hire an additional 10 operators.   INEOS advertised for, interviewed, and ultimately hired 11 new chemical operators.  Neither Sutton, Johnson, nor anyone else from PCSNO claims they played any role in INEOS' hiring of these new chemical operators.

[2] This number included nine chemical operators who were not offered positions with PCSNO, but were asked to stay and continue working at the Plant, as INEOS employees, for a period of time beyond December 31, 2007, to help during the transition so that the Plant could continue to operate safely.  They would still receive their severance packages after the transition period.

September 2007 (see fn. 1), and offered jobs by PCSNO, were inexperienced and required training on every aspect of the job. Ten of those eleven operators were under the age of 40. Also, in April 2008, PCSNO hired an additional twenty chemical operators, 18 of whom were under the age of 40. Miller asserts that the average age of the original group of INEOS operators was 48.57 years old. After April 2008, the average age had dropped to 40.04 years. Furthermore, 22 of the 23 employees who were not extended job offers by PCSNO were over the age of forty. Miller believes that the decision not to hire him for a job that he performed well for 28 years was the result of age discrimination in violation of both the disparate treatment and disparate impact provisions of R.C. 4112.02. He filed a complaint on June 5, 2008.

{¶10} Appellees deny that age played any part in their hiring decision, and state that they did not extend an offer of employment to Miller because he did not possess the characteristics that they wanted for the new workforce. Johnson and Sutton were both familiar with Miller and his work before the interview process. Sutton had known and interacted with Miller since 1992 and he had developed serious concerns about Miller's negative attitude toward management and his "silo-ed" mentality. Although Sutton personally got along with Miller, Sutton felt he would not fit in well with the new operational and teamwork culture PCSNO wanted to establish. Sutton believed Miller was "usually very negative toward the company" and "didn't promote a positive morale at the plant." Sutton was aware

that Miller was prone to needle co-workers to the point that several had asked to be reassigned to different jobs to avoid having to work with him. Johnson had not worked with Miller as closely or as long as Sutton, but he had heard from other employees about their negative experiences with Miller. Johnson also had the general impression that Miller sometimes bullied or intimidated some of his co-workers. Johnson personally had observed "that generally there was a different feel" in the control room whenever Miller was working in the unit. Two workers had personally told Johnson that after they accepted promotions, Miller "gave them a particularly hard time for no legitimate reason" and pretty much stopped talking to them unless absolutely necessary. Johnson also stated in his affidavit that "I also had the impression that [Miller] liked to perform only one job, the job of board operator for the urea area."

{¶11} After much discovery and the taking of numerous depositions, Appellees filed a motion for summary judgment contending that Miller had no evidence to support his claim that he was not hired because of his age and he could not establish that Appellees' stated reasons for not hiring him were pretextual. On October 16, 2009, the trial court granted Appellees' motion for summary judgment, finding that no genuine issue of material fact existed as to whether Appellees committed age discrimination in declining to hire Miller. It is from this judgment that Miller appeals, presenting the following two assignments of error for our review.

**First Assignment of Error**

**The trial court erred in granting summary judgment on Plaintiff-Appellant's disparate treatment age discrimination claim because Plaintiff-appellant raised genuine issues of material fact under the *McDonnell Douglas* method of proof and presented substantial evidence from which a jury could infer that Defendants' stated justification for their decision not to hire Plaintiff-Appellant were pretextual.**

**Second Assignment of Error**

**Because Plaintiff-Appellant raised genuine issues of material fact as to each element of his claim for disparate impact, the trial court erred when it granted summary judgment on Plaintiff-Appellant's disparate impact age discrimination claim.**

*Summary Judgment*

{¶12} Pursuant to Civ.R. 56(C), summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46. As such, summary judgment is appropriate when: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Horton v. Harwick Chemical Corp.*, 73 Ohio St.3d 679, 686-

687, 1995-Ohio-286, 653 N.E.2d 1196. An appellate court reviews a summary judgment order de novo. *Hillyer v. State Farm Mut. Auto. Ins. Co.* (1999), 131 Ohio App.3d 172, 175, 722 N.E.2d 108.

{¶13} The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 1996-Ohio-107, 662 N.E.2d 264. Once the moving party meets its initial burden, the nonmoving party must then produce competent Civ.R. 56(C) evidence demonstrating that there is a genuine, material issue for trial. *Dresher* at 293. In order to defeat summary judgment, the nonmoving party must produce evidence beyond allegations set forth in the pleadings and beyond conclusory statements in an affidavit. *Scott v. Marckel*, 3d Dist. No. 4-07-27, 2008-Ohio-2743, ¶18.

{¶14} When a court reviews the record, it is to draw all inferences in the light most favorable to the non-moving party. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶25. Although the court is not to engage in weighing of the evidence, to survive summary judgment an appellant must produce more than a scintilla of evidence in support of his position. *Schmitz v. Bob Evans Farms, Inc.* (1997), 120 Ohio App.3d 264, 268, 697 N.E.2d 1037. Ultimately, the proper inquiry is whether the state of the evidence is such that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party. Civ.R. 56(C); *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d

158, 2007-Ohio-5584, 876 N.E.2d 1217, ¶29. Where the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which it has the burden of proof, summary judgment is appropriate. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265, 274.

*Age Discrimination -- Disparate Treatment*

{¶15} In his first assignment of error, Miller argues that the trial court erred in granting summary judgment in favor of Appellees because the court impermissibly weighed the evidence and failed to construe the evidence in favor of Miller. Miller asserts that he successfully presented a prima facie case of disparate treatment age discrimination under R.C. 4112.01, and he claims that he presented extensive evidence that Appellees' stated reasons for not hiring him were pretextual.

{¶16} R.C. 4112.01(A) states:

**It shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.**

In interpreting the Ohio anti-discrimination statutes, Ohio courts have consistently looked to federal cases interpreting federal civil rights and age discrimination

Case No. 1-09-58

legislation,[3] in addition to Ohio case law. See, e.g., *Mauzy v. Kelly Svcs., Inc.*, 75 Ohio St.3d 578, 582, 1996-Ohio-265, 664 N.E.2d 1292; *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 147, 451 N.E.2d 807.

{¶17} When a plaintiff alleges disparate treatment discrimination, liability depends on whether the protected trait, i.e., age, actually motivated the employer's decision; that is, the plaintiff's age must have actually played a role in the employer's decision-making process and had a determinative influence on the outcome. *Reeves v. Sanderson Plumbing Prod., Inc.* (2000), 530 U.S.133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105. "Disparate treatment *** captures the essence of what Congress sought to prohibit in the ADEA. It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Hazen Paper Co. v. Biggins* (1993), 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338.

{¶18} There are two methods by which a plaintiff-employee may establish a prima facie case of disparate treatment age discrimination: (1) with direct evidence that the termination or other adverse action was motivated by age, or (2) in the absence of direct evidence, through a special burden-shifting means, often

---

[3] Under the Age Discrimination in Employment Act of 1967 (ADEA), it is "unlawful for an employer *** to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Case No. 1-09-58

referred to as the "*McDonnell Douglas*"[4] proof method. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 504-506, 575 N.E.2d 439. Regardless of the method utilized, the plaintiff at all times bears the burden of proof. *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407, 416; *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 67 L.Ed.2d 207, 215.

{¶19} Because discriminatory intent is seldom evidenced by overt actions and direct evidence, plaintiffs are more likely to raise a presumption of discrimination by utilizing the *McDonnell Douglas* evidentiary framework to establish a prima facie case. The initial burden is upon the plaintiff-employee to demonstrate by a preponderance of evidence that: (1) the plaintiff was a member of the statutorily protected class; (2) the plaintiff applied and was qualified for the position; (3) that, despite his or her qualifications, the plaintiff was rejected; and, (4) after the rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell*

---

[4] The United States Supreme Court has never squarely addressed whether this Title VII model, utilized in cases of race, gender, and other types of discrimination, is applicable in age discrimination cases under the ADEA. However, the Supreme Court has proceeded to analyze age discrimination cases under the *McDonnell Douglas* framework when the parties have not disputed the issue. See, e.g. *Gross v. FBL Financial Svcs. Inc.* (2009), -- U.S.--, 129 S.Ct. 2343, 2349, 174 L.Ed.2d 119. Ohio Courts have found the *McDonnell Douglas* framework applicable in age discrimination cases. See, e.g., *Barker v. Scovil*, 6 Ohio St.3d 146, 451 N.E.2d 807.

-12-

Case No. 1-09-58

*Douglas*, 11 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, 837 N.E.2d 1169, ¶10.[5]

{¶20} Once a plaintiff establishes a prima facie case, a presumption of age discrimination is created. The burden of production then shifts to the defendant-employer to overcome the presumption of discrimination by coming forward with evidence of a legitimate, nondiscriminatory reason for its actions. See *Allen v. Totes/Isotoner Corp.*, 123 Ohio St.3d 216, 2009-Ohio-4231, 915 N.E.2d 622, ¶4. If the employer articulates a nondiscriminatory reason, then the employer has successfully rebutted the presumption of discrimination that was raised by the prima facie case. *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250, 263, 661 N.E.2d 796.

{¶21} The plaintiff must then present evidence that the employer's proffered reason was a mere pretext for unlawful discrimination. *Manofsky v. Goodyear Tire & Rubber Co.* (1990), 69 Ohio App.3d 663, 668, 591 N.E.2d 752. The plaintiff's burden is to prove that the employer's reason was false and that discrimination was the real reason for the employer's actions. *Weiper v. W.A. Hill Assoc.*, 104 Ohio App.3d at 263, 661 N.E.2d 796. The ultimate inquiry in an employment-based age discrimination case is whether an employer took adverse

---

[5] We note that the steps for establishing a prima facie case are slightly modified when the case involves a discharge or a reduction in force (RIF). See, e.g., *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501, 575 N.E.2d 439, at the syllabus, modifying and explaining *Barker v. Scovill, Inc.*, supra*; Hamilton v. Sysco Food Servs. of Cleveland, Inc.*, 170 Ohio App.3d 203, 2006-Ohio-6419, 866 N.E.2d 559, ¶30.

-13-

action "because of" age; that age was the "reason" that the employer decided to act. *Gross v. FBL Financial Svcs. Inc.* (2009), -- U.S.--, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 ("To establish a disparate treatment claim, *** a plaintiff must prove that age was the 'but for' cause of the employer's adverse decision."). See also, *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781, ¶11; R.C. 4112.01(A).

{¶22} In Miller's case, there was no direct evidence of age discrimination, but the trial court found, and Appellees do not appear to dispute, that Miller has satisfied his burden of setting forth a prima facie case of age discrimination under the *McDonnell Douglas* model. Construing the evidence in favor of Miller, this Court finds that (1) Miller, being over 40, belonged to a protected class; (2) he was qualified for the job for which he applied ("At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.* (C.A.6, 2003), 317 F.3d 564, 575); (3) PCSNO declined to hire Miller; and (4) the position remained open and the employer continued to seek other candidates.

{¶23} After Miller established a prima facie case, the burden of production shifted to Appellees to articulate a legitimate, nondiscriminatory reason for not hiring Miller. See *Kohmescher v. Kroger Co.*, 61 Ohio St.3d at 505, 575 N.E.2d 439 61 Ohio St.3d at 505. We agree with the trial court, and Miller does not appear to dispute, that Appellees satisfied their burden of production when they

-14-

articulated that, when measured against PCSNO's stated hiring goals and based on their years of working with him, Johnson and Sutton concluded that Miller would not fit in well with the organizational changes and positive, teamwork culture they wanted for the new organization.

**{¶24}** If the employer can articulate a nondiscriminatory reason, then the presumption of discrimination raised by the prima facie case is rebutted and the employee's burden is to prove that the employer's reason for the adverse employment action was false, and that discrimination was the real reason. *Weiper,* 104 Ohio App.3d at 263, 661 N.E.2d 796, citing *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742, 125 L.Ed.2d 407. Therefore, Miller bears the burden of rebutting Appellees' proffered reasons for not hiring him by pointing to evidence that proves that Appellees' reasons were a pretext designed to mask age discrimination. To survive a summary judgment motion, Miller must show that a reasonable jury could conclude that the actual reasons offered by Appellees were a mere pretext for unlawful age-discrimination, not that other reasonable decision makers might have retained Miller. See *Rowan v. Lockheed Martin Energy Systems, Inc.*, (C.A.6, 2004), 360 F.3d 544, 550. The issue is not whether PCSNO made the best possible decision in not hiring Miller, but whether it made a discriminatory decision. *Stein v. National City Bank* (C.A.6, 1991), 942 F.2d 1062, 1065 ("It is not the function of courts to judge the wisdom of particular business policies").

**{¶25}** To establish pretext, a plaintiff must demonstrate "that the proffered reason (1) has no basis in fact; (2) did not actually motivate the employer's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.* (C.A.6, 2000), 231 F.3d 1016, 1021. Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against him. *Johnson v. Kroger Co.* (C.A.6, 2003), 319 F.3d 858, 866. "[A] reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (Emphasis in original.) *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 515, 113 S.Ct. at 2752, 125 L.Ed.2d 407.

**{¶26}** Miller argues that he satisfied his burden of proving that PCSNO's reasons for not hiring him were a pretext for age discrimination because he proffered: (a) evidence that younger, unqualified workers were hired instead of Miller; (b) evidence that PCSNO's reasons for its failure to hire Miller were factually false, contrived, and exaggerated; (c) evidence of alleged age-related comments by Johnson and Sutton; and (d) statistical evidence demonstrating Appellees' systematic elimination of older workers.

**{¶27}** First, Miller maintains that evidence that his knowledge and skill levels were superior to those outside the protected class who were retained should be sufficient to create an inference that Appellees' reasons for not hiring him were

pretextual. However, Miller's skills, abilities, attendance, and performance were never an issue and they were not the reason why he was not hired. The Appellees' testimony consistently stated that Miller was knowledgeable, well-qualified, safety conscious, and that his contributions to the Plant through the years were recognized and appreciated. However, Appellees repeatedly testified that he did not have the attitude and personality traits that the new management desired and believed were necessary to build a team consistent with their plans and goals for the new organization. Courts have consistently recognized that it is not unlawful to use subjective criteria to make employment decisions. See, e.g., *Browning v. Dep't. of Army* (C.A.6, 2006), 436 F.3d 692, 697.

{¶28} When asked to explain the criteria for the hiring decisions as to who would be retained, the HR manager, confirmed, "[b]asically [PCSNO] wanted to move forward with creating a new culture at the plant, with safety and teamwork as not all but mainly top priorities and wanted to foster teamwork, working well with their coworkers, a positive work environment ***." (Good Depo., p. 77). The twenty-five guideline questions that were used for interviewing the INEOS operators for positions with the new organization contained ten questions pertaining to teamwork and personality traits, while only half as many questions pertained to technical skills and knowledge.

{¶29} In an affidavit in support of Appellees' motion for summary judgment, Sutton addressed his reasons for offering employment to the eleven inexperienced operators who were hired by INEOS in September 2007:

> **[I]n mapping out how PCSNO would staff all of the chemical operator positions and be ready to go effective January 1, 2008, I had identified a number of entry level, "utility worker" positions that needed to be filled. I recommended that PCSNO offer employment to each of the chemical operators hired by INEOS in September 2007, because, in my opinion and based upon my knowledge of how long it takes a newly hired employee to become qualified in at least one position, I thought they would all be qualified to work safely and effectively for PCSNO as of January 1, 2008. Further, everything that I had heard about them indicated that they had positive attitudes towards the Company, their supervisors and managers, so I thought this also would allow them to be a good fit for the team-work oriented culture we were trying to build for PCSNO.**

{¶30} Although Miller had many talents and a great deal of experience, that was not the primary focus that motivated PCSNO's hiring decisions for all of the positions that needed to be filled. Furthermore, Miller's extensive experience would not have been a good match for the "utility worker" positions. It is well-settled that "[c]ourts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions." (Citations omitted.) *Bush v Am. Honda Motor Co., Inc.* (S.D. Ohio 2002), 227 F.Supp.2d 780, 797; see, also, *Jackson v. Gonzales* (D.C. Cir. 2007), 496 F.3d 703 ("given the dynamic nature of the hiring process *** we will not second guess how an employer weighs

particular factors in the hiring decision"). The fact that PCSNO's hiring criteria did not match Miller's strengths is not evidence of pretext.

**{¶31}** Next, Miller alleges that he created a material issue of fact concerning Appellees' stated reasons for not hiring him because he provided affidavits of former co-workers concerning Miller's positive attributes, stating that he was "respected *** for his knowledge and commitment to safety," "helpful and cooperative," "knowledgeable and helpful in explaining complex procedures," and was the "go-to guy" for those with questions in the unit. Miller also provided positive performance reviews (which, we note, were primarily from 1996 through 2000, when BP operated the Plant) which stated that Miller was "one of the most knowledgeable and experienced operators," along with records of many awards and commendations.

**{¶32}** However, these documents do not constitute evidence that would prove that Appellees' stated criteria were a pretext. The affidavits appear to be from friends of Miller who shared Miller's point of view.[6] These comments did not reflect the mind-set of the management members who were in charge of

---

[6] Several of the co-workers who provided the affidavits were also on the "do not hire" lists and/or were not offered permanent jobs with PCSNO.

hiring.[7]  More relevant to *management's* opinion of Miller's qualifications is the affidavit of Ernest Poling ("Poling").  Poling had previously supervised and worked with Miller.  Poling was a shift supervisor when he retired in 1999. However, in the spring of 2007, when he was 62 years old, Sutton contacted Poling and asked if he would come out of retirement to work at the facility because Sutton believed he would be a good addition to the management team. Poling was also offered employment by PCSNO as a shift supervisor at age 63. Poling did not interview Miller for a position with PCSNO.  However, during the time period when the interviews were being conducted, Poling told Sutton that:

> **I would not hire [Miller] if it were up to me.  I said this to [Sutton] because I had supervised and worked around [Miller] for at least 14 years.  In my opinion [Miller] had a bad attitude toward his job and his employer.  He also tended to be negative toward management.  I also found [Miller] to be very moody. When he came to work in a bad mood, it often had a very negative impact on the entire operations of the area.  I expressed my views about [Miller] to [Sutton] because even though [Miller] had many years of experience as a chemical operator, I thought PCSNO would be far better off not having him as part of its workforce.**

(Poling Affidavit, June 18, 2009.)

---

[7] Sutton testified that he had received a list of employees from an anonymous source with "DNH" (Do Not Hire) marked in front of several of the names, along with comments such as: "Infectious bad attitude -- chooses work to perform," "picks and chooses work, plays games, campaigns against co.," "constant critic of authority, infectious bad attitude," "lazy, attendance issues," "not a team player, disliked by crews," "constant critic of authority, infectious bad attitude,"  The commentary for Miller stated, "infectious bad attitude, chooses work, not a team player, not liked, crew bully."  (Sutton 2/5/09 Depo., Plaintiff's Ex. 23.) Although Sutton testified that the employment decisions were not based upon or influenced by this anonymous document, it demonstrated that others shared management's concerns about the attitude of some of the employees who were not offered positions with PCSNO.

{¶33} Miller's dated performance reviews were not necessarily relevant to the new and different standards set forth by the new management team. See *Peters v. Lincoln Elec. Co.* (C.A.6, 2002), 285 F.3d 456, 474 ("It is simply stating the obvious to observe that what may have satisfied one management regime does not necessarily satisfy its successor ***").  Furthermore, Miller cannot show pretext by the "good opinions of co-workers or previous supervisors." See *Weller v. Titanium Metals Corp.* (S.D. Ohio 2005), 361 F. Supp.2d 712, 722.; see, also, *Peters v. Lincoln Elec. Co.*, 285 F.3d at 474 (affidavits from co-workers did little, if anything, to rebut employer's reason and merely showed that the plaintiff had a good rapport with some of his co-workers.)  If every employee could create a triable issue of fact by proffering a positive *opinion* from a friend or co-worker, courtrooms would be overwhelmed with deciding employment issues that are within the realm of company management.  It is "the perception of the decision maker which is relevant," and not that of co-workers.  *Evans v. Technologies Applications & Serv. Co.* (C.A.4, 1996), 80 F.3d 954, 960-61.

{¶34} Miller further claims that comments made by Sutton and Johnson represented evidence of age stereotyping and demonstrated pretext.  Johnson had apparently made a comment referencing the "aging workforce" at the Plant.  Sutton allegedly stated that "the mindset around here must change, we have got to get rid of some of these older people."  (Klink Aff., ¶11.)  Sutton also expressed concern about the "BP/INEOS heritage" and the "old" INEOS "culture."

{¶35} In order for such age-related comments to constitute proof of discrimination, there must be a nexus between the alleged comment and the prohibited act of discrimination. *Byrnes v. LCI Communications*, 77 Ohio St.3d 125, 130, 1996-Ohio-307, 672 N.E.2d 145; *Street v. Gerstenslager Co.* (1995), 103 Ohio App.3d 156, 163, 658 N.E.2d 1105. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee * * *." *Byrnes*, 77 Ohio St.3d at 130, 672 N.E.2d 145. Thus, "derogatory co-worker comments do not substantiate a finding of employment discrimination, when such comments cannot be linked to the decisionmaker bringing forth the adverse action." *Evans v. Jay Instrument and Specialty Co.* (S.D.Ohio 1995), 889 F.Supp. 302, 310.

{¶36} Additionally, age-related comments which are "isolated, ambiguous, or abstract" cannot support a finding of age discrimination. *Byrnes*, 77 Ohio St.3d at 130, 672 N.E.2d 145. See, also, *Phelps v. Yale Security, Inc.* (C.A.6, 1993), 986 F.2d at 1020, 1025. In *Cooley v. Carmike Cinemas, Inc* (C.A.6, 1994)*, 25 F.3d 1325, 1330, the Sixth Circuit Court held that in age discrimination cases, statements allegedly showing an employer's age bias are to be evaluated by considering four factors: (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements

were more than merely vague, ambiguous or isolated remarks; and, (4) whether they were made proximate in time to the act of termination.

{¶37} We do not find that these isolated and stray remarks, which were far removed from the decision-making process, were evidence of a discriminatory animus. Johnson explained that in 2002 or 2003, he requested information about the age of the workforce to try to show the union that lay-offs could be avoided because required cost savings would likely be achieved through expected retirements and attrition. This one remark by Johnson, made years earlier, was an objective and accurate description of the Plant's workforce and was not evidence of age discrimination. Courts have recognized that it is not unlawful for employers to take pending retirements into account. See *Rowan v. Lockheed Martin Energy Systems, Inc.* (C.A.6, 2004), 360 F.3d 544 (employer's concern about pending retirements is not the same as bias against age).

{¶38} Likewise, Sutton's comments referring to the "heritage" and the "old" INEOS culture were referencing the former regime's way of doing things, and were not necessarily an age-related comment. Sutton testified in his deposition that the goal was to "get rid of the BP heritage or INEOS heritage *** and make a different plant, make a better plant to work in, a plant that ain't negative ***." The comment that Klink attributed to Sutton was referring primarily to the "mindset" of doing things the way they had been done in the past, under previous management. This isolated statement was made in 2003, long

before Sutton was employed by PCSNO and before he had any hiring authority or responsibility. There was no evidence that Sutton had ever shown any discriminatory animus towards Miller and there was no evidence that Sutton believed that all older workers (age-wise) believed in doing things the "old BP way." The fact that he hired many workers over the age of forty, fifty, and even sixty, belies any such discriminatory intent.

{¶39} And lastly, Miller presented evidence from a statistical expert, Dr. Burke, who calculated that from the pool of 72 chemical operators employed by INEOS, PCSNO chose to hire 95% of the chemical operators under the age of 40, while only 58% of the operators over age 40 were hired. Miller's expert stated that it was virtually certain that these results were not obtained by chance.

{¶40} However, we agree with the trial court's finding that the expert's statistical evidence was unreliable and inaccurate because it failed to take into account the fact that some of the chemical operators who were over the age of 40 had informed management that they did not want to be hired. Johnson and Sutton testified that at least eight chemical operators (with a range of 27 to 42 years of service) specifically told them that they did not want a job with PCSNO and would prefer to take the severance payments. However, the conditions placed upon the severance required them to apply. Statistical evidence is rendered suspect when the sample includes persons leaving their employment under incentive programs. *Tinker v. Sears, Roebuck & Co.* (C.A.6, 1997), 127 F.3d 519, 524.

{¶41} Even without a detailed analysis of what the hiring statistics would have been if those eight operators had not been included in the pool, we find the following statistics concerning the ages of the employees who were hired further negate Miller's claims that Appellees had a discriminatory animus against older workers. Of the 80[8] former INEOS employees that PCNOS hired, effective January 1, 2008, 57 employees were over the age of 40. Of these, 39 employees were Miller's age, 49 or older, and 15 employees were over the age of 55.

{¶42} Miller's conclusory statistical evidence was insufficient to establish pretext or prove discrimination because the analysis did not explain, consider, or eliminate whether other INEOS employees were not hired for the same or similar reasons Miller was not hired. Furthermore it did not distinguish between employees who did not want to be hired and those who PCSNO decided not to hire. And finally, the statistics showed that 71% of those who were hired by PCSNO were over the age of forty. The statistical evidence did not provide evidence of a discriminatory intent to eliminate older workers.

{¶43} Miller relies heavily on the United States Supreme Court's opinion in *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, to support his case and for the proposition that it is permissible for the trier of fact to infer the ultimate fact of employment discrimination from the falsity of the

---

[8] This number includes accounting, IT, maintenance, and administrative employees, as well as the chemical operators.

employer's explanation, in conjunction with a plaintiff's prima facie case of discrimination. However, Miller overstates the applicability of the decision in *Reeves* to the facts in this case. While it may be "permissible" in certain instances for a trier of fact to infer discrimination from the falsity of the employer's explanation, it is not necessary to do so, and the facts and the totality of the circumstances must support such an inference. Id.

{¶44} In *Reeves,* the 57-year-old plaintiff was fired after forty years of service, allegedly due to his failure to maintain accurate attendance records. At trial, Reeves established a prima facie case of discrimination, introduced evidence that he had accurately recorded the attendance and hours of the employees under his supervision, and also produced additional evidence that his employer was motivated by age-based animus. Id. The jury found in favor of Reeves and the trial court denied the employer's Rule 50 motion for judgment as a matter of law. The Fifth Circuit Court of Appeals reversed, finding that the evidence was insufficient to sustain the jury's verdict as a matter of law. The United States Supreme Court reversed this decision, finding that the appeals court had ignored relevant evidence and misconceived the plaintiff's evidentiary burden.

{¶45} As the Supreme Court in *Reeves* was careful to note, a prima facie case coupled with evidence of a false proffered reason "may permit" a fact-finder to infer a discriminatory purpose, "although such a finding will not always be adequate to sustain" a finding of liability. *Reeves,* 530 U.S. at 148, 120 S.Ct.

2097, 147 L.Ed.2d 105. One of the main distinctions between *Reeves* and the case before us today is that the plaintiff in *Reeves* made a "substantial showing that the employer's explanation was false." Id., 530 U.S. at 144, 120 S.Ct. 2097, 147 L.Ed.2d 105. Miller's evidence, however, amounted to little more than a difference of opinion with PCNOS' decision-making process; it did not amount to evidence of material facts from which a fact-finder could infer the falsity of Appellees' proffered non-discriminatory reasons. Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case. Id. at 148-49, 120 S.Ct. 2097, 147 L.Ed.2d 105.

{¶46} The ultimate inquiry in an employment-based age discrimination case is whether the plaintiff was a victim of intentional discrimination and was subject to an adverse employment decision *because of* his or her age, i.e., whether age was the "but for" cause of the employer's adverse decision. Id., 530 U.S. at 153; *Gross v. FBL Financial Svcs.*, -- U.S.--, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119; R.C. 4112.01(A). Viewing the evidence in favor of the non-moving party, we do not find that Miller has produced any evidence that PCSNO's decision would have been different had he been twenty, or even thirty years younger. Miller has failed to produce more than a scintilla of evidence that would create an issue of material fact as to whether PCSNO's proffered reasons for not hiring

Miller were pretextual. Miller has not met his burden to point to evidence to demonstrate that the reasons Appellees offered were not its true reasons but were merely a pretext for discrimination or were not worthy of credence. Therefore, Miller's first assignment of error is overruled.

*Age Discrimination – Disparate Impact*

{¶47} In his second assignment of error, Miller maintains that Appellees' policy of "changing the culture" to eliminate the "heritage" caused a disparate impact on older workers. He argues that his statistical evidence is proof that Appellees' hiring policies had a disproportional effect on older workers.

{¶48} There are, essentially, two theories of employment discrimination: disparate treatment and disparate impact. See *Hazen Paper*, 507 U.S. at 609, 113 S.Ct. 1701, 123 L.Ed.2d 338. In his first assignment of error, Miller argued that he was a victim of disparate treatment, i.e., the employer treats some people less favorably than others because of their race, gender, age, religion, nationality, or other protected characteristics. See id., quoting *Intl. Bhd. of Teamsters v. United States* (1997), 431 U.S. 324, 335-336, fn.15, 97 S.Ct. 1843, 52 L.Ed.2d 396.

Disparate impact claims,[9] on the other hand, involve employment practices that are facially neutral in their treatment of different groups but fall more harshly on one group. *Albaugh v. Columbus Div. of Police* (1999), 132 Ohio App.3d 545, 550, 725 N.E.2d 719, citing *Hazen Paper Co.*, 507 U.S. at 609, 113 S.Ct. 1701, 123 L.Ed.2d 338. Proof of discriminatory motive is not required under this theory of discrimination. Id.

{¶49} To establish a prima facie case of disparate impact, a plaintiff must: (1) identify the "particular employment practice"; (2) show a disparate impact on a protected group; and (3) prove that the employment practice caused the disparity. See *Meacham v. Knolls Atomic Power Lab.* (2008), 554 U.S. 84, 128 S.Ct. 2395, 2405, 171 L.Ed.2d 283. "The plaintiff is obliged to do more" than "merely alleg[e] a disparate impact, or point to a generalized policy"; the plaintiff is responsible for "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co.* (1989), 490 U.S. 642, 656-57, 109 S.Ct. 2115, 104 L.Ed.2d 733.

{¶50} The burden of identifying a specific-practice requirement is

_____

[9] Although the disparate impact theory of employment discrimination has been recognized for many decades and utilized to demonstrate discrimination based upon race, gender, and other protected traits, the United States Supreme Court only recently acknowledged its applicability to age discrimination in employment cases. See *Smith v. City of Jackson* (2005), 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 41. That decision also cautions that "the scope of disparate-impact liability under [the] ADEA is narrower than under Title VII." Id. The U.S. Supreme Court reasoned that "age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment." Id. The Ohio Supreme Court has not yet issued an opinion in an age discrimination employment claim under the disparate impact theory.

extremely important and is not a trivial burden. *Meacham v. Knolls*, 554 U.S. 84, 128 S.Ct. at 2406, 171 L.Ed.2d 283; *Smith v. City of Jackson* (2005), 544 U.S. 228, 241, 125 S.Ct. 1536, 161 L.Ed.2d 419. For example, in *City of Jackson*, the United States Supreme Court held that the employees had not raised a genuine issue of material fact because they had done little more than point out that the pay plan at issue was relatively less generous to older workers than to younger workers. The Court stated,

> **As we held in *Wards Cove*, it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities. \*\*\* [The] failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances.**

(Emphasis in the original; citations and internal quotation marks omitted.) *City of Jackson*, 544 U.S. at 241, 125 S.Ct. 1536, 161 L.Ed.2d 419.

{¶51} Miller has only pointed to the generalized hiring goals of PCSNO, including *some* of the qualifications that PCSNO was hoping to find in its workforce. These were the same criteria that Miller used in support of his disparate treatment claim in an attempt to prove that Appellees demonstrated a discriminatory *intent*. These attributes do not constitute a facially neutral, specific hiring practice, as found in other cases, where certain testing, educational, or physical requirements served to disproportionally affect a protected group. These

generalized qualifications were only one part of the over-all ideals that the hiring managers utilized. All of the evidence points to the fact that each employee was individually and subjectively evaluated before a hiring decision was made.

{¶52} Courts have repeatedly held that a plaintiff generally cannot establish a prima facie case under a disparate impact theory by showing only that the cumulative impact of the employer's selection procedures resulted in an adverse impact on members of a protected group. As one court noted, "[s]imply gesturing towards the hiring process as a whole will not satisfy the requirement that the plaintiff identify a 'specific employment practice' that is the cause of the statistical disparities." *Byrnie v. Town of Cromwell Bd. Of Educ.* (C.A.2, 2001), 243 F.3d 93, 111. Miller has failed to meet his threshold obligation of identifying a specific employment practice.

{¶53} Even if it could be found that Miller did identify a specific practice, he must then offer competent statistical evidence showing that the challenged practice caused an adverse effect. Miller's statistical evidence fails to reliably prove disparate impact. As we discussed above, Dr. Burke's statistical analysis was not accurate because it failed to take into account a large percentage of workers over the age of forty who did not want an offer of employment. Although Dr. Burke's affidavit made a brief, conclusory statement that even excluding those eight workers, the results were not likely to have happened by chance, he did not

provide any explanation or basis for this conclusion, nor did he offer any data connecting the results with a specific hiring practice.

{¶54} While plaintiffs frequently show a disparate impact by the use of statistics, courts must be careful to evaluate the proffered statistical analyses in light of the total circumstances present in a given case. *Teamsters*, 431 U.S. at, 339-40, 97 S.Ct. 1843, 52 L.Ed.2d 396. Incomplete or inapplicable analyses, simplistic percentage comparisons, and small sample sizes produce statistical analyses with little probative value. See, e.g., *New York City Transit Auth. v. Beazer* (1979), 440 U.S. 568, 582-87, 99 S.Ct. 1355, 59 L.Ed.2d 587.

{¶55} In addition to Dr. Burke's failure to take into account the older workers who did not want to be hired, there was no identification or analysis of any particular component of the selection process that allegedly caused the disparity. In a disparate impact case, the plaintiff must prove a causal link between a specific employment practice and disparities observed. *Wards Cove Packing,* 490 U.S 642, 109 S.Ct. 2115, 104 L.Ed.2d 733. Dr. Burke has acknowledged that he neither identified nor analyzed any particular aspect of Appellees' selection process, nor did he consider any other non-discriminatory variables which may have played a role in the decision making process.[10] Courts have consistently

---

[10] Although Dr. Burke has an impressive curriculum vitae listing an extensive history of high-profile litigation in which he had been involved, he acknowledged that he had done comparatively little statistical analysis in the area of employment discrimination or age discrimination. (Burke Depo., pp. 112-116.)

excluded statistical reports that ignore nondiscriminatory explanations for an alleged statistical disparity. *Hopson v. Daimler Chrysler Corp.* (C.A.6, 2005), 157 Fed. Appx. 813, 838; *Baeer v. The Scotts Co*, 10th Dist. No. 01AP-323, 2001-Ohio-3978.

**{¶56}** Miller has not set forth a prima facie case of disparate impact employment discrimination because he has failed to specifically identify a particular employment practice that, although facially neutral, had a disparate impact on older workers.[11] Further, his statistical evidence was incomplete and conclusory and was insufficient to establish his prima facie case. For the reasons stated above, Miller's second assignment of error is overruled.

*Conclusion*

**{¶57}** The broad issue before this Court is whether Miller presented sufficient evidence to withstand a motion for summary judgment. After reviewing the entire record, and considering the briefs, supplemental authority, and points raised at oral argument, and making all reasonable inferences in favor of Miller, we find that Miller has failed to do so with either his claim of disparate treatment

---

[11]Generally, once a plaintiff establishes a prima facie case of disparate impact, the employer has the opportunity to rebut the presumption of discrimination by producing evidence of a "business justification" for its "neutral" hiring criteria, or, under the ADEA, to demonstrate that the employer's actions were based upon a "reasonable factor other than age." See *Little Forest Medical Ctr. of Akron* (1991), 61 Ohio St.3d 607, 610-611, 575 N.E.2d 1164; *Meacham v. Knolls Atomic Power Lab.,* 554 U.S. 84, 128 S.Ct. at 2400. It is not necessary to examine the nature and scope of the Appellees' rebuttal in the case before us because Miller did not establish a prima facie case of disparate impact employment discrimination. However, we agree with the trial court's findings that even if Miller had established a prima facie case, Appellees produced sufficient evidence of a business justification and reasonable factors other than age to explain their hiring decisions and rebut Miller's claims.

or his claim of disparate impact. Therefore, having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**